## AARON THOMAS v. THE STATE.

No. 2532.   Decided April 29, 1903.

**1.—Murder—Evidence in Rebuttal.**

On a trial for murder, where defendant in his testimony as a witness had stated that at the time he killed deceased he, deceased, had a pistol which he fired at defendant immediately before defendant fired the fatal shot, it was competent for the State to rebut this evidence by testimony to the effect that before the shooting a party had taken deceased's pistol from him and hid it in the grass about one hundred yards from where the homicide occurred.

**2.—Same—Evidence.**

On a trial for murder, where a witness had testified that when deceased was shot she was holding him; it was competent to permit her to so testify; and, as corroborative of her testimony, to exhibit to the jury her waist and skirt which had blood upon them caused by the wound inflicted by defendant upon deceased.

**3.—Same—Opinion Evidence.**

On a trial for murder it was competent for a witness, who testified that the wound upon deceased was a round hole about the size of a guinea's egg, to state that in his opinion such a wound was made by a shotgun fired within a few feet of deceased.

**4.—Same—Charge on Murder in Second Degree.**

Murder in the second degree is predicated upon the fact that it was done unlawfully upon sudden passion upon implied malice aforethought, and without adequate cause. And a charge upon murder in the second degree, to be sufficient, must define implied malice and also adequate cause, so that the jury may fully understand murder in the second degree.

**5.—Same.**

A charge upon murder in the second degree is not sufficient which, in effect, simply instructed the jury to convict defendant of murder in the second degree if he killed deceased with a deadly weapon in a sudden transport of passion, and not in defense of himself.

Appeal from the District Court of Falls. Tried below before Hon. Sam R. Scott.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of Savas Grigsby, on the 19th day of July, 1902, by shooting him with a gun.

Deceased with several others, including the brothers of defendant, all negroes, were returning late at night from a festival at Jim Bledsoe's. Deceased raised a racket or fuss, but about what is not shown. Defendant was at home and in bed, and hearing the fuss ran to his father-in-law's house, and getting his shotgun ran down to the scene of the difficulty. Defendant testified that when he reached the scene of the difficulty deceased was being held by two men, and when he asked what the matter was, deceased broke loose from those holding him and made at him with his pistol, when he raised his gun and shot him.

Jim Bledsoe testified: "On the night that Savas was killed I gave a party. Savas was there and a great many other darkies of the neighbodhood. I don5t know of any row or disagreement at the party. Savas was drinking some. After Savas and Doll Baty and several others left the house, I heard two shots down the road and went down there. Doll Baty, and I think George Holmes, had hold of Savas, and were trying to get his pistol from him. Baty told me to help him, and I held Savas and Baty took his pistol away from him, and went over to the side of the road and dropped the pistol behind a stump near a fence post. Then we all went down the road with Savas, taking him home. When we got down the road about seventy-five or a hundred yards, Bertha Grigsby came down to where we were and wanted to take Savas; pretty soon after she came Minerva Grigsby came, and about the time she got there the defendant, Aaron Thomas, came up. He had a shotgun and when he got about six or eight feet from Savas, he said, 'Turn the God-damned son of a bitch loose and let me kill him.' He raised his gun up like he was going to shoot, and I turned Savas loose and fell down in some weeds, and Aaron Thomas fired. About the time Thomas fired the shot there was another shot fired. I don't know who fired it. I know that Savas didn't have a pistol, and he did not fire the shot. I was with him just a few minutes before when Baty took his pistol away and put it behind the stump. That was about seventy-five yards from where the killing occurred. I know the Payne boys. All of them are older than Savas. I was present when Doll Baty brought Savas' pistol up a few minutes after the killing occurred. He showed it to Savas' mother, and I think he gave it to Savas' brother, but I am not sure. At the time Baty took Savas' pistol away from him

the defendant was not present, and it was several minutes after this that 'the shooting took place."

Minerva Grigsby testified she was the mother of deceased; that she was at home on the night of the homicide and was in bed; that she heard the fuss and racket down the road and recognized the voice of her son, and that she immediately went down there; that she met the defendant on the road, who passed her and who was also going down to the trouble with a gun in his hands; that there was quite a crowd down there and just as she got there the defendant told them to turn the deceased loose and let him kill the God-damn son of a bitch; that they turned him loose and then she rushed up to her son and had him in her arms when the defendant fired the fatal shot; that the pistol taken up there was her son's pistol; that there were two shots fired; that the defendant fired the first shot, but didn't know who fired the second shot; that it was fired from behind. That defendant had a single-barrel shotgun; that Alex Payne was there when she got there and was running around with a pistol in his hands cursing deceased and telling them to turn him loose.

Bertha Grigsby, sister of deceased, for the State, testified: That she was present when the deceased was shot; that when deceased got in the fuss her mother heard the racket down the road and woke her up and that she and her mother ran down there; that when she got there Jim Bledsoe and George Holmes had hold of deceased, and I asked deceased what was the matter down there and he said, "Nothing; just having a little racket." I told him to come on and go home, and he gave me his hand and started to go, but the men who had him would not let him go—they said they would take him. That about that time defendant comes running up with a shotgun and says, "What is the matter down here?" and says, "Turn the God-damn son of a bitch loose and let me kill him;" that by that time she ran up to defendant and tells him not to shoot, and he said, "Get away, God damn you," and knocked her down, and just then her mother run up there and put her arms around deceased and told defendant not to shoot; about that time defendant put his gun up to his shoulder and shot deceased right over me; that her brother was about the same size as defendant; that defendant and deceased lived on the same place in Falls County; the defendant got there after she did.

Over defendant's objection the court permitted Minerva Grigsby to exhibit to the jury the clothing, with blood stains on it, which she said she was wearing at the time deceased was shot.

Defendant also objected to the opinion evidence of Justice of the Peace Hays, to the effect that from the size and character of the hole in deceased's breast it was his opinion that the gun was fired in a few feet. of deceased, the witness not having qualified as an expert.

The charge of the court upon murder in the second degree is set out in the opinion.

45 Crim.—8.

*Rice & Bartlett,* for appellant, as to error in permitting the clothing of Minerva Grigsby to be exhibited to the jury, contended that it was inadmissible because not the clothing of deceased, and because it could not illustrate any issue in the case; and they cited Wharton's Crim. Ev., sec. 767; 1 McClain's Crim. Law, sec. 405; Head v. State, 50 S. W. Rep., 352; Hart v. State, 15 Texas Crim. App., 230; King v. State, 13 Texas Crim. App., 280; Kidwell v. State, 35 Texas Crim. Rep., 266.

As to error in admitting the opinion evidence of the witness Hays, they cited Head v. State, 50 S. W. Rep., 352; Cooper v. State, 23 Texas, 331; Blain v. State, 33 Texas Crim. Rep., 236; White's Code Crim. Proc., sec. 1094.

As to error in the court's charge upon murder in the second degree, and failure to charge upon manslaughter, they cited Whitaker v. State, 12 Texas Crim. App., 436; Brunet v. State, 12 Texas Crim. App., 521; Boyd v. State, 28 Texas Crim. App., 140; Jacobs v. State, 28 Texas Crim. App., 82; Wadlington v. State, 28 Texas Crim. App., 419; Guffe v. State, 8 Texas Crim. App., 187.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of ten years; hence this appeal.

Appellant objected to the State proving by the witness Jim Bledsoe that before the shooting by appellant in which deceased was killed, he saw Doll Baty take deceased's pistol away from him and hide it behind a stump in some grass; that the homicide occurred about 100 yards from where the pistol was hid. Said testimony was objected to because appellant was absent at the time said pistol was hid, and was not apprised of such fact. The court explains the admission of this testimony by stating that defendant proved by himself and other witnesses that deceased had a pistol at the time he was killed, by defendant, and fired said pistol at him immediately before defendant fired the fatal shot. We believe this testimony was competent to rebut the State's evidence. It could have been proven, in order to rebut this evidence, that after the homicide, in the absence of appellant, the body of deceased was examined and no pistol was found on his person or near him. Or it could have been shown that he had but one pistol, and that he left it at home. So we take it that any fact or circumstance showing or tending to show deceased did not have a pistol at the time, was competent testimony to meet the case made by appellant, to the effect that deceased did have a pistol and used it on that occasion. What we have said in regard to this bill disposes of appellant's bill of exceptions number 9, with reference to the testimony of Julius Dubose as to the finding of deceased's pistol after the difficulty.

Nor do we think the court committed any error in permitting the witness Minerva Grigsby, the mother of deceased, to testify that the

certain waist and skirt which she exhibited to the jury were the ones worn by her on the night the deceased was shot and killed by defendant; and that said waist and skirt had blood on them, and was caused by the wound inflicted by defendant on deceased; that she was holding deceased at the time he was shot, and this caused the blood on her garments. As shown by the court, this was in rebuttal of appellant's testimony that no one was holding deceased at the time he was shot, and that Minerva Grigsby was not present when the shot was fired. The blood on her garments was merely an incident corroborative of her testimony. We do not believe the authorities with reference to the admission of the clothing worn by deceased at the time of the homicide have anything to do with this question. The evidence was not offered to show any physical marks of bullets or knife on the clothing and thus illustrate how the killing was done, but merely as an incident in connection with the testimony of the witness and corroborative of her statement.

Appellant objected to the testimony of Hayes, who was allowed by the court to state that the wound in deceased's breast was a round hole and about the size of a guinea egg; and that, in his opinion, from the examination of the size and nature of the wound in the body of deceased, the gun with which same was shot was fired within a few feet of the deceased, and that he based his opinion thereon because he had frequently seen beeves shot with a shotgun, and knew the character of wound a shotgun would make in a beef-steer when fired at close range. We do not believe it required an expert witness to state this; but was. At any rate, appellant was not prejudiced thereby, inasmuch as appellant himself testified that he shot deceased with a shotgun at close the statement of a fact which occurs in the ordinary observance of men. range, being only a few feet away, and the judge's explanation shows this.

The court gave the jury the following charge: "If you believe from the evidence beyond a reasonable doubt that defendant with a deadly weapon, or with an instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden transport of passion, and not in defense of himself against an unlawful attack reasonably producing a rational fear or expectation of death or serious bodily injury, with the intent to kill, did shoot and thereby kill Savas Grigsby, as charged in the indictment, you will find him guilty of murder in the second degree," etc. This charge was objected to on the ground that it omitted the phrase "aroused without adequate cause," and permitted the conviction of defendant for murder in the second degree, notwithstanding the jury might have believed the killing was done in a sudden transport of passion aroused with adequate cause. And further, because the killing, under the circumstances indicated in said charge, could have been of no higher degree than that of manslaughter. And further, because said charge failed to define implied malice. In this connection it will be noticed that the court defined implied malice

as follows: "Implied malice is that which the law infers from or imputes to certain acts, however suddenly done; thus, when the fact of an unlawful killing is established, and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree," etc. There is no charge in the case on manslaughter, and no attempt made to define adequate cause. The jury are merely told in the charge, as to that, if appellant killed deceased with a deadly weapon in a sudden transport of passion, and not in defense of himself, to find him guilty of murder in the second degree. They are not even told that the killing must be unlawful; nor that the killing must be done upon implied malice in order to constitute it murder in the second degree. The law requires that before a homicide can be murder in the second degree it must be unlawfully done, and upon malice aforethought. It has been held that, when the court gives a charge defining implied malice, bounding it on the one side by murder in the first degree and on the other side by manslaughter, it is necessary, in order that the jury may understand the definition of implied malice, that the court define adequate cause which goes to constitute manslaughter. Whitaker v. State, 12 Texas. Crim App., 436; Burnet v. State, 12 Texas Crim. App., 521; Neyland v. State, 13 Texas Crim. App., 536. The doctrine announced in these cases is as stated above. In Neyland's case, supra, it is said "that a jury may be instructed as to implied malice, or murder in the second degree, without involving the law of manslaughter, based on sudden passion aroused on adequate cause. However, when a charge is given defining murder in the second degree, as a killing in sudden passion without adequate cause, then adequate cause must be defined so that the jury may understand the charge on murder in the second degree." In Boyd v. State, 28 Texas Crim. App., 137, this question was again discussed, and Judge Wilson suggested a charge in the following terms: "Implied malice is that which the law infers from or imputes to certain acts. Thus, when the fact of an unlawful killing is established, and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse or justify the act, then the law implies malice. If, therefore, you believe from the evidence that the defendant unlawfully killed the deceased and, in doing so, did not act under the immediate influence of sudden anger, rage, resentment or terror, arising from an adequate cause—that is, such as would, in a person of ordinary temper, render the mind incapable of cool reflection—the killing would be upon implied malice, and he would be guilty of murder in the second degree." We do not understand this doctrine to be overruled, but rather reaffirmed, in Childs v. State, 35 Texas Crim. Rep., 574, and Scruggs v. State, 35 Texas Crim. Rep., 624. In both of said cases charges were given on manslaughter, in which adequate cause was defined, so that the jury had a criterion to determine whether or not the killing was done upon implied malice in a sudden transport of passion, with adequate

cause.  We do not believe the charge of the court on murder in the second degree was a correct enunciation of the law.

Appellant also contends that a charge on manslaughter should have been given, as the facts tend to show such a defense.  We have examined the record, and from the State's case, we fail to see anything less than murder.  From the defendant's standpoint it was self-defense, and there was no manslaughter in the case.

Appellant also insist that a new trial should be granted on account of the misconduct of the jury, in that they determined the amount of punishment assessed against appellant by lot.  Considering the testimony of some of the jurors in connection with the result reached, it looks very much like the jury arrived at their verdict by lot.  However, this is contradicted by others of the jury, who testified there was no agreement to be bound by the result reached.  We do not deem it necessary to decide this question.

For the errors heretofore discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*