## FRANK v. UNITED STATES.
### No. 6065.

Circuit Court of Appeals, Ninth Circuit.
July 7, 1930.

624

Thomas R. Lyons and Ira D. Orton, both of Seattle, Wash., and O. D. Cochran and Hugh O'Neill, both of Nome, Alaska, for appellant.

J. H. Hart, U. S. Atty., of Nome, Alaska, for the United States.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

The appellant was convicted of murder in the first degree and sentenced to life imprisonment. He appeals from that judgment and relies upon certain errors occurring during the trial, but admits that the evidence was sufficient to sustain the verdict.

It is conceded that the defendant killed Joseph William Sparrow at 2 a. m., December 4, 1928, at Nome, Alaska. The defendant claims that the homicide was in necessary self-defense. It appears from the evidence that the defendant was engaged as an employee in a pool room and saloon in Nome, Alaska, and that his wife, who went by the name of Eva Thompson, was living separate and apart from him in Nome. Early on the morning of December 3, defendant visited the place kept by his wife and engaged in a

row. The next day complaint was made to one of the peace officers of the city concerning the conduct of the defendant at the time and place in question. The prosecution claimed, and offered evidence sufficient to prove, if believed, that during the day of December 3 the defendant made inquiries to ascertain the name of the person who had complained to the peace officer concerning his conduct the night before; that he ascertained, or at least believed, that the deceased had given such information; and that thereupon he threatened dire vengeance. These threats, so far as they relate to the deceased, are denied by the defendant, who testified that on the evening of December 3, about 10 o'clock, the deceased visited him at the pool room and he and the deceased went outside the pool room. In the conversation or altercation which there occurred, so the defendant testified, the deceased complained to the defendant that he had heard of threats against him uttered by the defendant and that deceased thereupon threatened to kill the defendant. In the course of the conversation, according to the testimony of the defendant, deceased stated that he would visit the premises of said Eva Thompson as often as he wanted to and that if he met the defendant there, the "best man would win." Thereafter, on the same night, the defendant closed his premises, and, taking a revolver, went to the premises occupied by his wife to see if he could "bum something to eat." He arrived there about 2 a. m. He found the premises lighted, the inmates of the place dancing. He entered the storm shed and knocked on the front door. After knocking a second time an inmate named Marie White opened the door, and defendant entered. He further testified:

"Marie then put her arms around me and pushed me backwards, the door was opened and Marie pushed me against the door until the door swung back against a chair behind the door. She looked in my face and said 'Huh.' I then saw Sparrow coming from towards the kitchen door. He had a claw hammer in his right hand. When he advanced to within two or three feet of me and had the claw hammer in a striking position I put up my hand and shot. I shot over Marie's shoulder. When I shot Sparrow the blow from the hammer was on the way. I certainly believed that my life was in danger."

This shot entered the body of the deceased and caused his death. According to the testimony of the defendant, after he fired the fatal shot he insisted upon the deceased put-

ting down the hammer. This, he said, the deceased did, left the house, and died a short distance from the front door. According to the defendant, the fatal shot was fired within ten seconds after the door was opened by Marie White. The prosecution contends that the shooting was the result of the deliberate purpose of the defendant to punish the deceased for the alleged report to the peace officer, and the defendant concedes that the testimony of the prosecution was sufficient to justify this conclusion, if believed by the jury, but contends that the instruction given by the trial judge on the issue of self-defense was erroneous. The defendant requested an instruction to the general effect that he was entitled to stand his ground and resist an apparently dangerous assault by the deceased by the use of adequate force even to the extent of killing his opponent. The court declined to give this instruction and instructed the jury on that subject as follows:

"Before a person can avail himself of the defense that he used a weapon in defense of his own life, the jury must be satisfied from the testimony that the defense was necessary; that the defendant did all he could consistently with his own safety to avoid it and it was necessary to protect his own life or to protect himself from such serious bodily harm as would give him reasonable apprehension that his life was in immediate danger."

The court also, after setting forth the right of the defendant to defend himself to the extent of taking the life of his assailant, added this qualification:

"This general rule, however, must be taken with the qualifications that it is the duty of a person when attacked to retreat as far as the fierceness of the assault will permit."

The doctrine thus enunciated has been a source of difficulty in the law of self-defense, and the courts have taken two divergent views with relation thereto: One, the view thus taken by the trial judge; and, the other, the view that a person unlawfully assaulted can stand his ground and resist force by force, even to the extent of taking life, when that is necessary in order to enable the defendant to stand his ground without danger of great bodily harm or death. The Supreme Court in a recent case has been called upon to pass upon this mooted question. In Brown v. United States, 257 F. 46, the Circuit Court of Appeals had held that under the circumstances therein set forth, the rule applied in the case at bar by the trial judge was applicable. The Supreme Court reversed the decision of the Circuit Court of Appeals because of this erroneous conclusion and held that it was not the duty of the defendant to retreat before forcibly resisting the assault. Brown v. U. S., 256 U. S. 335, 41 S. Ct. 501, 502, 65 L. Ed. 961, 18 A. L. R. 1276. Of this rule the court said:

"Rationally the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt. The law has grown, and even if historical mistakes have contributed to its growth it has tended in the direction of rules consistent with human nature. Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant he may stand his ground and that if he kills him he has not exceeded the bounds of lawful self defense. That has been the decision of this Court. Beard v. United States, 158 U. S. 550, 559, 15 S. Ct. 962, 39 L. Ed. 1086. Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore in this court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him. Rowe v. United States, 164 U. S. 546, 558, 17 S. Ct. 172, 41 L. Ed. 547. The law of Texas very strongly adopts these views as is shown by many cases, of which it is enough to cite two. Cooper v. State, 49 Tex. Cr. R. 28, 38, 89 S. W. 1068; Baltrip v. State, 30 Tex. App. 545, 549, 17 S. W. 1106."

Two of the witnesses to the shooting agreed that the deceased had no hammer, made no assault, and was shot without warning by the defendant, who immediately upon entry closed the door and opened fire on the deceased, who was unarmed; nevertheless the defendant was entitled to have the jury weigh the credibility of his testimony as against the other witnesses under proper instructions from the court. The doctrine invoked by the defendant is necessarily based upon the proposition that the party who stands his ground, even to the extent of killing his assailant, has a right to be where he is (section 30, C. J. 71, note 47; People v. Maughs, 149 Cal. 253, 86 P. 187; Boykin v. People, 22 Colo. 496, 45 P. 419), and to assert that right against a wrongful assault which would invade that right. If he has no right to be or to remain where he is, and his assailant has a better right there, he should retreat to a place where

he is entitled to assert his right to stand his ground, if the violence of the assault permits, before repelling force by force.

The instruction given by the court assumes as a matter of law that the defendant did not have a right to stand his ground and resist an assault made upon him. Whether or not under all the circumstances he had the right to stand his ground depends upon a conclusion of fact, which conclusion was one for the jury. There are facts in the evidence from which the jury might infer that there was an implied invitation to the defendant to. enter the premises at the time and place in question, arising from his previous visits, from his relation to the inmates, and from the fact that the door was opened in response to his knock. On the other hand, there was evidence from which the jury might infer that the defendant was not a welcome guest, that an effort was being made to expel him from the house by those authorized so to do, and if the jury should conclude that such was the fact defendant would not be entitled to stand his ground and resist an assault made upon him for the purpose of expelling him from the house until he had retreated from the premises if the violence of the assault permitted him so to do without danger of death or great bodily harm reasonably apprehended. It was for the jury to say, then, whether as a result of the row the night before, the threatened combat, the conduct of Marie White immediately upon the entry of the defendant into the room, followed by the conduct of the deceased, the implied invitation or license to the defendant to enter the house and remain there was thus revoked.

Counsel for the defendant, in his argument, assumes that the defendant had equal rights with Sparrow upon the premises in question, and the government relies upon the abstract rule that the defendant must in every case retreat if he can safely do so and thus avoid the necessity of killing the assailant. In view of our conclusion that the instruction as given is erroneous unless the facts justify a conclusion that the defendant did not have a right to remain on the premises, the judgment must be reversed. This we are more inclined to do, because we believe that the court placed an undue burden upon the defendant in its instructions concerning the weight of the evidence necessary to sustain the defense that the homicide occurred in the exercise of the right of self-defense, as follows:

"Before a person can avail himself of the defense that he used a weapon in defense of his own life, the jury must be satisfied from the testimony that the defense was necessary; that the defendant did all he could consistently with his own safety to avoid it and it was necessary to protect his own life or to protect himself from such serious bodily harm as would give him reasonable apprehension that his life was in immediate danger. If defendant, not having brought the trouble upon himself, the deceased, Joseph William Sparrow, came against the defendant with a deadly weapon, apparently meaning to use it and manifested that it was his intention to take the life of the defendant or to inflict upon him great bodily harm, then the defendant might kill said Joseph William Sparrow if necessary to repel the assault to save his own life or to protect himself from great bodily injury; and in such case, if you find it to be a fact, the homicide would be excusable in law. This general rule, however, must be taken with the qualifications that it is the duty of a person when attacked to retreat as far as the fierceness of the assault will permit. * * *

"If, with these tests applied, the jury are satisfied that there was then an apparently imminent danger of death or serious bodily harm to the defendant, he was entitled to act upon the appearances. Applying then the law to the facts of the case and the situation and circumstances of the parties at the time the fatal shot was fired and all other facts and circumstances in evidence, you will determine whether the homicide committed by the defendant was committed in self-defense and was, therefore, excusable, or whether it was murder in the first degree, murder in the second degree, or manslaughter, or not guilty, and return your verdict accordingly."

These instructions place upon the defendant the burden of establishing self-defense by at least a preponderance of the evidence.

As was stated by the court in Wacaser v. People, 134 Ill. 438, 25 N. E. 564, 565, 23 Am. St. Rep. 683, such instruction requires even more than a preponderance of the evidence. The court there said:

"In Herrick v. Gary, 83 Ill. 85, which was a civil case, the instruction was: 'The plaintiff must show, by the evidence in the case, to the satisfaction of the jury,' etc. We there said of this language: 'It places the standard of the degree of proof required higher than the law demands in controversies of this character. It is enough that the jury shall believe, from the evidence, that the essential facts are true. The jury may so believe, although the same may not be shown

627

by the evidence to the satisfaction of the jury. This instruction requires not merely that the evidence shall produce belief in the mind of the jury of the facts alleged, but that such belief shall be so strong as to be satisfactory. This is perhaps not quite so strong as to require a belief beyond a reasonable doubt, but it approximates it, and that is only required in criminal cases. The mind cannot well be said to be satisfied as to a given proposition so long as such matter remains at all in doubt. For this reason the instruction must be condemned.'"

To the same effect, see the decision of the Supreme Court of California in People v. Ullah Mohammed, 189 Cal. 429, 208 P. 963.

It is not altogether clear that the court intended to so instruct the jury, for later in the instructions after charging the jury that if they had a reasonable doubt as to which of two degrees of homicide the defendant was guilty they should find him guilty of the lesser degree only. The court instructed the jury:

"And upon such consideration if you find him not guilty of murder in the first degree or murder in the second degree and have any reasonable doubt about his being guilty of manslaughter, you should find him not guilty."

The jury were also instructed:

"If upon the law and the evidence you shall find and believe beyond a reasonable doubt that the defendant is guilty of murder in the first degree, or of murder in the second degree, as heretofore explained to you in these instructions, then it would be your duty to return that verdict which the law and the evidence justifies, and you would have no right or power to find him guilty of manslaughter. But if from the evidence, or the want of evidence, you have a reasonable doubt about some one or more of the elements constituting the crimes of murder in the first degree or of murder in the second degree, having been proved, then it would be your duty to find the defendant not guilty of the higher offense and you should then consider whether the defendant is guilty of the lesser crime, as the case may be, or of manslaughter, and if not guilty of any of the crimes mentioned, beyond a reasonable doubt, then you are to find the defendant not guilty. * * *"

The court further instructed the jury:

"You are instructed that in criminal cases, and this is a criminal case, the guilt of the accused must be established by the evidence beyond a reasonable doubt, before the jury can find the defendant guilty of the crime charged in the indictment, or any lesser crime necessarily included in the indictment concerning which I shall hereafter instruct you."

Again the jury were instructed:

"If you entertain any reasonable doubt upon any single fact or element necessary to constitute the crime it is your duty to give the defendant the benefit of such doubt and acquit him."

There are instructions, however, which seem to set the instructions as to self-defense somewhat apart from the other instructions. For illustration, the court instructed the jury:

"I further instruct you that before you can find a verdict of murder in the first degree you must also find and believe from the evidence beyond a reasonable doubt that the homicide, if any, was committed by the defendant purposely; that is, that it was done intentionally; and also that it was done with deliberate and premeditated malice; and also that it was not done justifiably nor excusably nor in self-defense as I shall hereafter explain those terms to you."

The question as to the degree of proof required by the defendant in a criminal case to establish his defense is of the utmost importance. The courts of last resort are not in harmony upon this question. In a great majority of the states, and particularly in the more recent decisions in such states, it is held that while the burden of establishing self-defense is upon the defendant unless the evidence of the prosecution discloses sufficient evidence thereof, the burden is sustained when, as a result of the whole evidence, a reasonable doubt has been created in the minds of the jury as to whether or not the homicide was in self-defense. If, from a consideration of the whole evidence, the jury entertains a reasonable doubt upon that question, that doubt is to be determined, like all other doubts in the case, in favor of the defendant. Ex parte Williams, 213 Ala. 121, 104 So. 282; People v. Roe, 189 Cal. 548, 209 P. 560; People v. Durand, 307 Ill. 611, 139 N. E. 78; People v. Duncan, 315 Ill. 106, 145 N. E. 810; Little v. Commonwealth, 210 Ky. 494, 276 S. W. 158; State v. Scarborough, 152 La. 669, 94 So. 204; State v. Powell, 54 Mont. 217, 169 P. 46; State v. Leakey, 44 Mont. 354, 120 P. 234; State v. Pruett, 24 N. M. 68, 172 P. 1044; Brown v. State, 15 Okl. Cr. 64, 175 P. 66; Culpepper v. State, 4 Okl. Cr. 103, 111 P. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668; State v. Holbrook, 98 Or. 43, 188 P. 947, 192 P.

640, 193 P. 434; Lane v. State, 44 Fla. 105, 32 So. 896; People v. Epaski, 57 App. Div. 91, 67 N. Y. S. 1033; People v. Shanley, 49 App. Div. 56, 63 N. Y. S. 449; People v. Downs, 123 N. Y. 558, 25 N. E. 988; Petty v. State, 76 Ark. 516, 89 S. W. 465; Zipperian v. People, 33 Colo. 134, 79 P. 1018; Trogdon v. State, 133 Ind. 1, 32 N. E. 725; Lawson v. State, 171 Ind. 431, 84 N. E. 974; People v. Coughlin, 67 Mich. 466, 35 N. W. 72; Hawthorne v. State, 58 Miss. 778; Gravely v. State, 38 Neb. 871, 57 N. W. 751; State v. McCluer, 5 Nev. 132; Brown v. State, 62 N. J. Law, 666, 42 A. 811; State v. Jones, 71 N. J. Law, 543, 60 A. 396; State v. Hazlet, 16 N. D. 426, 113 N. W. 374; Hamilton v. State, 97 Tenn. 452, 37 S. W. 194; Cupps v. State, 120 Wis. 504, 97 N. W. 210, 98 N. W. 546, 102 Am. St. Rep. 996; Trumble v. Territory, 3 Wyo. 280, 21 P. 1081, 6 L. R. A. 384; State v. Churchill, 52 Wash. 210, 100 P. 309; United States v. Lewis (C. C.) 111 F. 630; Foster v. Territory, 6 Ariz. 240, 56 P. 738; State v. Fowler, 52 Iowa, 103, 2 N. W. 983; State v. Hayden, 131 Iowa, 1, 107 N. W. 929; Cogdell v. State, 43 Tex. Cr. R. 178, 63 S. W. 645; State v. Zeigler, 40 W. Va. 593, 21 S. E. 763; State v. Lundhigh, 30 Idaho, 365, 164 P. 690; State v. McGrath, 119 Minn. 321, 138 N. W. 310.

We think that this is the correct rule, and apparently this rule has been followed by the District Courts in Alaska. In Huber v. United States (C. C. A.) 259 F. 766, 769, the instruction given by the trial court upon the subject of self-defense is therein set forth. This instruction contains the following statement:

"Applying the foregoing principles of law to the evidence in this case, if you find it to be true, or entertain a reasonable doubt whether or not it is true, that at the time and place stated in the indictment the deceased * * * (then follows a statement of the circumstances justifying self-defense) * * * then the defendant had a lawful right to defend himself * * * and if in doing so the said Mathias Schernthaner met his death, it was justifiable homicide in self-defense, and you should find the defendant not guilty. * * *"

In Owens v. United States (C. C. A.) 130 F. 279, 281, the instruction therein set forth, after stating circumstances justifying self-defense, states:

"Applying the foregoing principle of law to this case, if you find from the evidence, or entertain a reasonable doubt whether or not it is true, that at the time mentioned in the indictment the deceased, Christensen, attacked the defendant * * *" (here follows a statement of the principles of self-defense).

Later in the same instruction therein set forth it is made clear that the jury from the evidence must be satisfied beyond a reasonable doubt that the homicide was not justifiable. These decisions are not authority upon the mooted question as to the weight of evidence necessary to acquit a defendant. They indicate, however, the character of the instruction given by the court upon this subject in the District Court of Alaska. On the other hand, at least thirteen states require that self-defense must be established by at least a preponderance of the evidence. State v. Little, 178 N. C. 722, 100 S. E. 877; Com. v. Nelson, 294 Pa. 544, 144 A. 542; Com. v. Ross, 266 Pa. 580, 110 A. 327; State v. Hardin, 91 W. Va. 149, 112 S. E. 401; Coolman v. State, 163 Ind. 503, 72 N. E. 568; State v. Thrailkill, 71 S. C. 136, 50 S. E. 551; Smith v. State, 142 Ind. 288, 41 N. E. 595; State v. Tabor, 95 Mo. 585, 8 S. W. 744; Silvus v. State, 22 Ohio St. 90; Commonwealth v. York, 9 Metc. (Mass.) 93, 43 Am. Dec. 373; State v. Ballou, 20 R. I. 607, 40 A. 861; State v. Yokum, 11 S. D. 544, 79 N. W. 835; People v. Callaghan, 4 Utah, 49, 6 P. 49; Vaiden v. Com., 12 Grat. (53 Va.) 717; State v. Powell, 5 Pennewill (Del.) 24, 61 A. 966; Marcas v. State, 149 Ga. 209, 99 S. E. 614.

The Supreme Court was confronted with a similar divergence of authority with reference to the question of quantum of proof essential to entitle a defendant to an acquittal on a charge of murder on the ground of insanity.

In Davis v. United States, 160 U. S. 469, 16 S. Ct. 353, 357, 40 L. Ed. 499, the decisions, pro and con, are cited by the Attorney General in his argument found on pages 471, 472, of 160 U. S., 16 S. Ct. 353. The Supreme Court held that where the evidence raised a reasonable doubt in the minds of the jury as to the sanity of the defendant he was entitled to an acquittal. The court said:

"We are unable to assent to the doctrine that in a prosecution for murder, the defense being insanity, and the fact of the killing with a deadly weapon being clearly established, it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity of the accused at the time of the killing. On the contrary, he is entitled to an acquittal of the specific crime

charged if, upon all the evidence, there is reasonable doubt whether he was capable in law of committing crime. ? * ?

"Upon whom, then, must rest the burden of proving that the accused, whose life it is sought to take under the forms of law, belongs to a class capable of committing crime? On principle, it must rest upon those who affirm that he has committed the crime for which he is indicted. That burden is not fully discharged, nor is there any legal right to take the life of the accused, until guilt is made to appear from all the evidence in the case. The plea of not guilty is unlike a special plea in a civil action, which, admitting the case averred, seeks to establish substantive ground of defense by a preponderance of evidence. It is not in confession and avoidance, for it is a plea that controverts the existence of every fact essential to constitute the crime charged. Upon that plea the accused may stand, shielded by the presumption of his innocence, until it appears that he is guilty; and his guilt cannot, in the very nature of things, be regarded as proved, if the jury entertain a reasonable doubt from all the evidence whether he was legally capable of committing crime. * * *

"If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged. His guilt cannot be said to have been proved beyond a reasonable doubt—his will and his acts cannot be held to have joined in perpetrating the murder charged—if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he willfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased * * *

"How, then, upon principle, or consistently with humanity, can a verdict of guilty be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit that crime?"

This decision definitely places the federal courts with those courts holding that where there is a reasonable doubt as to whether the killing was or was not committed in justifiable self-defense the defendant is entitled to an acquittal. See, also, State v. Lundhigh, 30 Idaho, 365, 164 P. 690.

In view of the necessity of a new trial we will now consider other assignments of error.

In the course of a long instruction correctly defining murder in the first degree, murder in the second degree, and manslaughter, and defining the right of self-defense, the court instructed the jury as follows:

"If, then, upon consideration of all the facts and circumstances in evidence you are satisfied beyond a reasonable doubt that the defendant killed Joseph William Sparrow with malice aforethought, as above defined, it would be your duty to find him guilty of murder as charged in the indictment."

The jury were thus instructed that the defendant must be found guilty of murder if found that the killing was with malice aforethought. The defendant presents a learned discussion of many cases to the effect that malice aforethought does not necessarily include that degree of deliberation essential to establish murder in the first degree. But the instruction complained of, rightly construed, does not deal with the degree of murder. While the indictment charges the defendant with murder in the first degree, the court, in its instructions to the jury, construed it as charging murder in the first and in the second degrees, instructing the jury that:

"The defendant in this case is accused by the indictment of murder in the first degree, but included in such charge is the crime of murder in the second degree and the crime also of manslaughter."

In view of this definite instruction by the court that the indictment in legal effect covered both degrees of murder, it would be necessary for the jury to consider other portions of the instructions, if they found the defendant guilty of killing with malice aforethought, to determine the degree of the murder thus committed by the defendant. It is conceded that the court correctly defined the two degrees of murder. That it was the intention of the court in using the word "murder" in the sentence of the instruction above quoted, and objected to by the appellant, to include both murder in the first and murder in the second degree, is also made manifest by a consideration of the context of the instruction in which occurs the sentence to which the defendant objects. It is as follows:

"Malice as thus described, is either express or implied. Express malice is where one with a sedate and deliberate mind and formed design kills another, which formed design is evidenced by external circumstances, discovering that inward intention; as by antecedent menaces, former grudges and concerted schemes to do bodily harm. Express malice is seldom proved upon the trial of a

case. The existence or non-existence of malice is a matter to be determined by the jury from a consideration of all the facts and evidence. The proof of homicide as involving malice must show the facts under which the killing was effected, and from the whole facts and circumstances surrounding the killing the jury infers malice or its absence. Malice, if existing, is to be inferred from all of the facts in the case considered as a whole; every fact, no matter how small; every circumstance, no matter how trivial, which bears on the question of malice must be considered by the jury at the same time that they consider the use of the deadly weapon if any and it is only as a conclusion from all of those facts and circumstances that malice, if inferred at all, is to be inferred. It implies premeditation, a prior intent to do the act. It may have existed but for a moment, an inappreciably brief period of time, no longer. No limit has been or can be fixed as to its duration. If it in fact existed for any period, however brief, the killing would be murder; but, if malice was wanting, the homicide cannot be of a higher grade of offense than manslaughter. If, then, upon consideration of all facts and circumstances in evidence you are satisfied beyond a reasonable doubt that the defendant killed Joseph William Sparrow with malice aforethought, as above defined, it would be your duty to find him guilty of murder as charged in the indictment. But, if you conclude that he is not guilty of murder in the first degree or of murder in the second degree, as I have defined these two degrees of murder, you will next determine whether he is guilty of manslaughter."

During the impanelment of the jury, defendant interposed a challenge to the juror D. B. Camp upon the ground of actual bias. The challenge was denied and the ruling of the court was excepted to, and the juror was then challenged peremptorily and excused. The defendant exhausted the number of peremptory challenges allowed by statute but did not ask leave of court to exercise another peremptory challenge. Nor does it affirmatively appear that the defendant was dissatisfied with any juror selected to try the case or made his dissatisfaction known to the court if he was not in fact satisfied. The juror who was challenged for actual bias testified in effect that he had formed an opinion but that in his judgment he could try the defendant fairly and impartially. After considerable cross-examination, the challenge was denied, and this ruling rests so largely in the discretion of the trial court that we might base our decision on the ground that

the court did not go beyond the bounds of sound discretion in denying the challenge. However, we prefer to rest our decision upon the ground that in any event no prejudicial error resulted from the ruling of the court. It is uniformly held that where challenge for actual bias is denied and the defendant has an opportunity to eliminate the juror by exercising a peremptory challenge and fails to do so, he cannot thereafter complain of the ruling denying his challenge unless and until he has otherwise exercised all his peremptory challenges. The courts are divided upon the question as to whether or not the mere exercise of the statutory number of challenges by the defendant, after the acceptance of the biased juror without calling attention of the court to the defendant's desire to exclude from the jury some member thereof, is reversible error. In many states it is held that under such circumstances the error is not prejudicial. McRae v. State, 62 Fla. 74, 57 So. 348; Cromer v. Borders Coal Co., 152 Ill. App. 555; State v. Foster, 136 Iowa, 527, 114 N. W. 36; State v. Addison, 134 La. 542, 64 So. 497; Shumway v. State, 82 Neb. 152, 117 N. W. 407; Colbert v. Journal Pub. Co., 19 N. M. 156, 142 P. 146; State v. Sultan, 142 N. C. 569, 54 S. E. 841, 9 Ann. Cas. 310; Guthrie v. Snyder, 43 Okl. 334, 143 P. 8; Darnell v. State, 123 Tenn. 663, 134 S. W. 307; King v. State (Tex. Cr. App.) 100 S. W. 387; Gomez v. State, 75 Tex. Cr. R. 239, 170 S. W. 711; State v. Thorne, 41 Utah, 414, 126 P. 286, Ann. Cas. 1915D, 90; State v. Megorden, 49 Or. 259, 88 P. 306, 14 Ann. Cas. 130; People v. Schafer, 161 Cal. 573, 119 P. 920; Sullins v. State, 79 Ark. 127, 95 S. W. 159, 9 Ann. Cas. 275; Pearce v. Quincy Mining Co., 149 Mich. 112, 112 N. W. 739, 12 Ann. Cas. 304.

In other states it has been held that the mere fact that the defendant had exhausted his peremptory challenges, after being compelled to exercise a peremptory challenge to excuse a juror challenged for cause, entitled him to a review of the ruling of the court upon his challenge for cause. State v. Stentz, 30 Wash. 134, 70 P. 241, 63 L. R. A. 807; McMahon et ux. v. Carlisle-Pennell Lbr. Co., 135 Wash. 27, 236 P. 797. See, also, cases cited in note Ann. Cas. 1915D, page 98. In McMahon et ux. v. Carlisle-Pennell Lumber Co., 135 Wash. 27, 236 P. 797, the Supreme Court of Washington was called upon to review its previous ruling holding that a mere exhaustion of peremptory challenges alone was sufficient to entitle the party to complain of an erroneous ruling upon a challenge to a juror for cause; it was there conceded by

the court that the Washington cases were in conflict with the general rule upon the subject; but the court adhered to its opinion, notwithstanding the fact that an unprejudicial jury was obtained, for the reason that the defendant was denied a valuable right accorded him by the law, namely, the right to challenge an additional juror peremptorily without giving any reason therefor. Even in this view, which we think is clearly correct, if the defendant requests an additional peremptory challenge and the court grants that right, the error would undoubtedly be cured. It would seem reasonable to expect this much from the defendant if he was dissatisfied. If the defendant is dissatisfied with the jury or any member of the panel selected to try the case, he should manifest that fact to the trial court, and in the absence of some objection or request to exercise an additional peremptory challenge, he ought not to be heard to complain upon appeal of an error which was corrected by his exercise of a peremptory challenge to the juror challenged for cause. If later he found that because he had thus cured the error of the trial judge, he would be forced to accept an objectionable juror whom he could not challenge for cause he should have called the attention of the trial court to that fact. The injury to him was not sustained by the ruling of the court on the challenge for cause. If he was thereby injured it would be for the reason that after exhausting his peremptory challenges he was thereby required to accept an unsatisfactory juror. In the case at bar he may in fact have actually preferred the jurors thus selected to others yet to be drawn, and for that reason might remain silent awaiting a chance to complain of the denial of a right which he did not in fact desire to exercise. It is fair to presume that upon such a request, made at a time when it is usually evident that a jury can be quickly completed because only challenges for cause can be interposed, the court would grant such a request.

The reason for the line of cases requiring some objection from the defendant after the exhaustion of his peremptory challenges is more tersely stated by the Supreme Court of California in People v. Schafer, 161 Cal. 573, 119 P. 920, 921, supra, decided in 1911:

"While the record shows that the defendant did subsequently exhaust his 10 peremptory challenges, it does not appear that he had occasion or desire to use an additional peremptory challenge, or that each and all of the 12 jurors finally accepted and sworn were not entirely satisfactory to him. All that the record shows in this connection is the examination of Mr. Fraser and the proceedings and ruling upon the challenge for cause interposed to him, and the fact that the defendant used 10 peremptory challenges, including that used on Mr. Fraser. This is not enough to warrant reversal for error in the ruling on the challenge for cause to Mr. Fraser. It is entirely consistent with the record that the 12 jurors who actually tried the case were absolutely satisfactory to defendant, and that he desired all of them to serve, and would not have excused any one of them if he had been given the opportunity. After judgment, the contrary should not be presumed."

The Supreme Court in Stroud v. United States, 251 U. S. 15, 40 S. Ct. 50, 52, 64 L. Ed. 103, held that the alleged error of the trial court in denying a challenge for cause could not be reviewed where the juror was challenged peremptorily and where the defendant was given an additional challenge. The court there stated:

"The juror was peremptorily challenged by the accused, and did not sit upon the jury. The statute, in cases of this character, allowed the accused 20 peremptory challenges; it appears that he was in fact allowed twenty-two peremptory challenges. Thus his right to exercise peremptory challenges was not abridged to his prejudice by an erroneous ruling as to the challenge for cause. In view of this fact, and since there is nothing in the record to show that any juror who sat upon the trial was in fact objectionable, we are unable to discover anything which requires a reversal upon this ground." (Citing cases.)

On rehearing of this case, 251 U. S. 380, 40 S. Ct. 176, 64 L. Ed. 317, the Supreme Court adhered to its ruling, although concluding that the defendant was allowed only one additional peremptory challenge. Under this decision it is clear that the defendant must request an additional peremptory challenge or in some way manifest his dissatisfaction with the jury or some member thereof in order to take advantage of the fact that he has been compelled to exercise one of his peremptory challenges to excuse an objectionable juror.

During the impanelment of the jury, the names in the jury box were exhausted three different times, and the court, in conformity with the statutes of Alaska (Session Laws of Alaska for 1925, p. 29, c. 16, § 1), each time directed the clerk to draw from the jury box additional names and the marshal to summon

the persons whose names were thus drawn from the box. It is claimed by the appellant that the statute under which this was permitted was violative of the Organic Act of Alaska (37 Stat. 512, c. 387, § 3 [48 USCA § 80]). This section provides that "the legislature shall pass no law depriving the judges and officers of the district court of Alaska of any authority, jurisdiction, or function exercised by like judges or officers of district courts of the United States." It is claimed by appellant that the provision of the act of the territorial Legislature, above referred to (Session Laws 1925, p. 29, c. 16, § 1), deprives the marshal of authority exercised by marshals of the District Court of the United States, in that he was required to serve a venire upon a list of jurors drawn from the trial jury box instead of exercising his official privilege of selecting such jurors from the bystanders and the body of the district. In determining that question attention should be given to a later remedial act, passed by Congress in 1914, upon this subject (38 Stat. 710, c. 292 [48 USCA § 91]), providing that nothing in the act of Congress above referred to "shall be so construed as to prevent the courts now existing or that may be hereafter created in said Territory from enforcing within their respective jurisdictions all laws passed by the legislature within the power conferred upon it, the same as if such laws were passed by Congress, nor to prevent the legislature passing laws imposing additional duties, not inconsistent with the present duties of their respective offices, upon the governor, marshals, deputy marshals, clerks of the district courts, and United States commissioners acting as justices of the peace, judges of probate courts, recorders, and coroners. * * * " It is clear that the territorial Legislature is thus authorized to modify the duties of the marshal by adding thereto such duties as are not inconsistent with the duties already imposed upon him by reason of his duties corresponding to those of a marshal of the district courts of the United States. The courts are also empowered by this act to enforce the legislation of the Alaskan Legislature enacted under the power conferred upon it. One of the duties imposed upon the marshal by the act of Congress providing for a civil government for Alaska (23 Stat. 24, c. 53, § 6) is the service of all process of the District Court. Section 6 provides as follows:

"That the marshal for said district shall have the general authority and powers of the United States marshals of the States and Territories. He shall be the executive officer of said court, and charged with the execution of all process of said court. * * * "

In Tynan v. United States, 297 F. 177, this court held that the Alaska Legislature had power to prescribe the qualification of jurors and the mode of their selection. If the Legislature is otherwise empowered to enact legislation with relation to the selection of jurors to complete the panel, as we have thus held, the mere fact that the process of the court issued in pursuance of such legislation would require the marshal to summon the jurors mentioned in the venire, instead of others he might otherwise select if so directed by the court, would not be a sufficient ground to declare the territorial legislation invalid. It is the duty of the marshal to serve the process of the court and a jury thus secured by such process is a legal body.

When the case came on for trial on the 19th day of March, 1929, defendant moved for a continuance, and, as a condition of granting the motion, consent to taking the deposition of several of the witnesses was given. The depositions were taken in the presence of the defendant and his counsel, who cross-examined the witnesses.

■■ When the case came on for trial on the 9th day of August, 1929, the appellee offered the deposition of George Bagley. This deposition was objected to on the ground that although the deposition was taken by the consent of the defendant and in his presence, the deposition was signed by the witness without the presence of the defendant. It is admitted that no changes by alteration or addition were made in the deposition and that as signed it represents the testimony given by the witness in the presence of the defendant. Under the circumstances, the signature of the witness was a mere formal attestation of the questions and answers therein contained, and the failure to sign the deposition in the presence of the defendant could not be regarded as prejudicial. We do not feel it necessary, however, to pursue this subject further, for the reason that under the law of Alaska (Compiled Laws of Alaska, § 1206) objections to the method of taking the deposition are required to be presented to the court within twenty days after the deposition is filed with the court. No such objection was made here and consequently was waived. The purpose of this requirement evidently is to prevent surprise to a party who relies upon a deposition which he believes has been taken in accordance with law.

Judgment reversed.